Filed 10/20/20; Certified for Publication 11/16/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| COUNTY OF MONTEREY, as Successor Agency, etc., | C085041 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2016-80002403-CU-WM-GDS) |
| v. | |
| KEELY BOSLER, as Director, etc. et al., | |
| Defendants and Respondents; | |
| UCP EAST GARRISON LLC et al., | |
| Real Parties in Interest and Respondents. | |

This case arises out of what we have previously characterized as the "Great Dissolution" of California's redevelopment agencies (RDAs). (*City of Azusa v. Cohen* (2015) 238 Cal.App.4th 619, 622-623.) "In 2011, the political branches of our state government decided as a matter of public policy that abuses of the redevelopment law,

1

which constituted an ever-growing drain on state finances, required the dissolution of nearly 400 [RDAs] and the winding down of outstanding redevelopment obligations." (*City of Tracy v. Cohen* (2016) 3 Cal.App.5th 852, 855.) To this end, the Legislature enacted statutes in June 2011 that barred RDAs from entering into new obligations and provided a process for dissolving RDAs, and for ascertaining and paying their existing "enforceable obligations." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 241, 250-251 (*Matosantos*); *City of Grass Valley v. Cohen* (2017) 17 Cal.App.5th 567, 573 (*Grass Valley*); *City of Petaluma v. Cohen* (2015) 238 Cal.App.4th 1430, 1434-1436 (*Petaluma*).) The enactment of these statutes reflected a state policy to curtail perceived abuses by cities and counties creating RDAs that took property taxes away from other local agencies such as schools, police and fire protection services, and contributed to a budget crisis.[1] (Health & Saf. Code, § 34167, subd. (a);[2] *Grass Valley, supra*, 17 Cal.App.5th at p. 573; *Petaluma, supra*, 238 Cal.App.4th at p. 1434.)

Plaintiff County of Monterey (County) appeals from the judgment entered following the trial court's denial of its petition for writ of mandate and complaint for declaratory and injunctive relief.[3] The County, which is the successor agency for its former RDA, challenges decisions by the Department of Finance (Department) relating to a development known as the East Garrison Project, which is part of the Fort Ord Redevelopment Project located on a closed military base in Monterey. The County claims the trial court erroneously determined that a written agreement entered into

---

[1] In June 2012, the Legislature enacted "clean-up" legislation to the 2011 dissolution legislation (Assem. Bill No. 1484 (2011-2012 Reg. Sess.); Stats. 2012, ch. 26). We refer to both of these laws together as the dissolution law.

[2] Undesignated statutory references are to the Health and Safety Code.

[3] The County filed its notice of appeal in June 2017. Briefing was completed in August 2018. The panel as presently constituted was assigned this matter in May 2020.

between its former RDA and a private developer (real party in interest, UCP East Garrison, LLC, hereafter UCP) was not an enforceable obligation within the meaning of the dissolution law because the former RDA did not have the authority to approve the agreement on the date the governor signed the 2011 dissolution legislation. The County further contends that the trial court erred in determining that the County failed to show the Department abused its discretion in disapproving two separate requests for funding related to administration of the East Garrison Project. The County insists that these administrative costs were expended to complete an enforceable obligation within the meaning of the dissolution law, and therefore the Department should have approved its requests for payment of such costs. Finally, the County argues that the Department's application of the dissolution law improperly impaired UCP's contractual rights.

We reject the County's contentions and affirm the judgment.

## BACKGROUND

*The Law Dissolving RDAs*

"In the aftermath of World War II, the Legislature authorized the formation of community [RDAs] in order to remediate urban decay. [Citations.] The Community Redevelopment Law 'was intended to help local governments revitalize blighted communities.' [Citations.] It has since become a principal instrument of economic development, mostly for cities, with nearly 400 [RDAs] now active in California." (*Matosantos, supra,* 53 Cal.4th at pp. 245-246, fn. omitted.) "While [RDAs] have used their powers in a wide variety of ways, in one common type of project the [RDA] buys and assembles parcels of land, builds or enhances the site's infrastructure, and transfers the land to private parties on favorable terms for residential and/or commercial development." (*Id*. at p. 246.)

RDAs generally cannot levy taxes. Instead, they rely on a tax increment funding method. (*Matosantos, supra,* 53 Cal.4th at p. 246.) "Under this method, those public entities entitled to receive property tax revenue in a redevelopment project area (the

3

cities, counties, special districts, and school districts containing territory in the area) are allocated a portion based on the assessed value of the property prior to the effective date of the redevelopment plan. Any tax revenue in excess of that amount—the tax increment created by the increased value of project area property—goes to the [RDA] for repayment of debt incurred to finance the project. [Citations.] In essence, property tax revenues for entities other than the [RDA] are frozen, while revenue from any increase in value is awarded to the [RDA] on the theory that the increase is the result of redevelopment." (*Matosantos, supra,* 53 Cal.4th at pp. 246-247.)

"The property tax increment revenue received by a [RDA] must be held in a special fund for repayment of indebtedness . . . . Once the entire debt incurred for a project has been repaid, all property tax revenue in the project area is allocated to local taxing agencies . . . ." (*Matosantos, supra*, 53 Cal.4th at p. 247.)

"A powerful and flexible tool for community economic development, tax increment financing nonetheless 'has sometimes been misused to subsidize a city's economic development through the diversion of property tax revenues from other taxing entities . . . .' " (*Matosantos, supra,* 53 Cal.4th at p. 247.) Over time, "a perception had grown that some [RDAs] were used as shams to divert property tax revenues that otherwise would fund general local governmental services, and legislative efforts were made to address these concerns." (*City of Emeryville v. Cohen* (2015) 233 Cal.App.4th 293, 298.) These concerns grew as the State's financial condition worsened. "Responding to a declared state fiscal emergency," in June 2011 the Legislature enacted legislation (Assem. Bill No. 26 (2011-2012 1st Ex. Sess.) enacted as Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5 (Assembly Bill 1X 26)) that "bars [RDAs] from engaging in new business and provides for their windup and dissolution." (*Matosantos*, *supra*, 53 Cal.4th at p. 241.)

4

In December 2011, our Supreme Court upheld Assembly Bill 1X 26. (*Matosantos, supra*, 53 Cal.4th at pp. 274-275) As therein described, Assembly Bill 1X 26 consisted of two principal components, codified in two new parts of the Health and Safety Code. (*Matosantos,* at p. 250.) "Part 1.8 . . . is the 'freeze' component: it subjects [RDAs] to restrictions on new bonds or other indebtedness; new plans or changes to existing plans; and new partnerships, including joint powers authorities [citations]. Cities and counties are barred from creating any new [RDAs]. [Citation.] Existing obligations are unaffected; [RDAs] may continue to make payments and perform existing obligations until other agencies take over. [Citation.] Part 1.8's purpose is to preserve [RDA] assets and revenues for use by 'local governments to fund core governmental services' such as fire protection, police, and schools. [Citation.]

"Part 1.85 . . . is the dissolution component. It dissolves all [RDAs] [citation] and transfers control of [RDA] assets to successor agencies, which are contemplated to be the city or county that created the [RDA] [citations]. Part 1.85 requires successor agencies to continue to make payments and perform existing obligations. [Citation.] However, unencumbered balances of [RDA] funds must be remitted to the county auditor-controller for distribution to cities, the county, special districts, and school districts in proportion to what each agency would have received absent the [RDAs]. [Citations.] Proceeds from [RDA] asset sales likewise must go to the county auditor-controller for similar distribution. [Citation.] Finally, tax increment revenues that would have gone to [RDAs] must be deposited in a local trust fund each county is required to create and administer. [Citations.] All amounts necessary to satisfy administrative costs, pass-through payments, and enforceable obligations will be allocated for those purposes, while any excess will be deemed property tax revenue and distributed in the same fashion as balances and assets." (*Matosantos, supra*, 53 Cal.4th at pp. 250-251.)

The "freeze" component of Assembly Bill 1X 26 became effective immediately upon gubernatorial signature on June 28, 2011, while the dissolution component of the legislation did not become operative until after the decision in *Matosantos*, which lifted a judicial stay of Part 1.85 and reformed its effective date from October 1, 2011, to February 1, 2012. (See *Matosantos*, 53 Cal.4th at pp. 250-251; *Grass Valley, supra,* 17 Cal.App.5th at pp. 573-574; *City of Big Bear Lake v. Cohen* (2017) 12 Cal.App.5th 922, 931 (*Big Bear Lake*).)

Under the dissolution law, all RDAs and RDA components of community development agencies are to be eliminated. (§ 34172, subd. (a)(1).) "[A]ll authority, rights, powers, duties, and obligations previously vested with the former [RDAs], under the Community Redevelopment Law, are . . . vested in . . . successor agencies." (§ 34173, subd. (b).) Here, the County acts as successor agency to its former RDA. (§§ 34171, subd. (j), 34173.) Successor agencies are obligated to "[c]ontinue to make payments due for enforceable obligations" (§ 34177, subd. (a)) and to "[e]xpeditiously wind down the affairs of the [RDA]" under "the direction of the oversight board" (§ 34177, subd. (h)). The oversight board consists of appointed members and has "fiduciary responsibilities to holders of enforceable obligations." (§ 34179, subds. (a) & (i).) Enforceable obligations include loans borrowed by the former RDA and any existing legally binding and enforceable agreement that is not otherwise void as violating the debt limit or public policy (§ 34171, subd. (d)(1)(B) & (E)), but do *not* include any agreements or contracts between the city or county that created the RDA and the former RDA (*id*. subd. (d)(2)).

To obtain funds to make payments required by enforceable obligations, a successor agency must periodically prepare recognized obligation payment schedules (ROPS) setting forth the minimum payment amounts for each enforceable obligation and identify one or more sources of payment, and submit the ROPS to the oversight board for

6

approval.[4]  (§§ 34171, subds. (g) & (h), 34177, subd. (l )(1).)  Following the oversight board's approval, the successor agency must submit the ROPS to the Department for its approval.  (§ 34177, subds. (m)(1) & (o)(1).)  The Department then makes "its determination of the enforceable obligations and the amounts and funding sources of the enforceable obligation."  (*Ibid.*)  A successor agency or oversight board cannot restore funding for an enforceable obligation that was denied or reduced by the Department. (§ 34178, subd. (c).)

Each county auditor-controller takes the property tax proceeds (the tax increment) that would have gone to the former RDA and places such money in a redevelopment property tax trust fund (the trust fund).  (§ 34172, subd. (d).)  Money in the trust fund is used to pay the former RDA's required contributions to schools, enforceable obligations approved on a ROPS, and administrative costs.  (§ 34183, subd. (a)(1)-(a)(3).)  Any remaining money is distributed to local taxing entities.  (§ 34183, subd. (a)(4).)

A successor agency may seek judicial review when the Department disapproves the inclusion of items proposed as enforceable obligations in a ROPS.  (*Grass Valley, supra,* 17 Cal.App.5th at pp. 574-575.)

*The East Garrison Project*

Fort Ord was a military base that closed in 1994.  After the closure of Fort Ord, the County obtained title to a portion of the former base and, in 2002, adopted the Fort Ord Redevelopment Plan.

---

[4] Successor agencies were initially required to prepare a ROPS for each six-month fiscal period from January 1, 2012, through June 30, 2016.  Thereafter, successor agencies are only required to prepare a ROPS for each fiscal year.  (§§ 34171, subd. (h), 34177, subds. (a)(1), (l)(1), (m)(1) & (o)(1).)

In October 2005, the County granted its former RDA an interest in real property known as "Track 0" of the East Garrison of the Fort Ord Redevelopment Area. At the same time, the County adopted the East Garrison Specific Plan and approved a vesting map and development agreement for the redevelopment of Track 0 of the East Garrison, which is known as the East Garrison Project. In addition, the County's former RDA entered into a Disposition and Development Agreement (2005 DDA) with a private developer, East Garrison Partners, LLC (East Garrison Partners), for the development of the East Garrison Project, which is a mixed-use development of dwelling units (including low and moderate income housing), commercial space, parks, and public facilities (e.g., fire station). Under the terms of the 2005 DDA, East Garrison Partners agreed to pay the former RDA $1,500,000 as initial payment for the purchase of the East Garrison Project area, plus additional payments from proceeds from the development of that project. In exchange, the former RDA agreed to pledge tax increment produced by the "Project," including costs of administering the "Project Area,"[5] and for the development of specific portions of the Project, including public improvements and facilities. As relevant here, the amount of tax increment pledged included: (1) up to $300,000 annually for costs of administering the Project Area, with a fixed escalation of three percent (3%) per year; and (2) up to $9.5 million for affordable housing.

Due to the great recession, East Garrison Partners invoked an "enforced delay" clause in the 2005 DDA in May 2008. In November 2008, the former RDA accepted the enforced delay. After East Garrison Partners defaulted on loan obligations to a third-party, a new developer, real party in interest UCP, purchased the defaulted loan in September 2009. However, it was not until June 28, 2011 (i.e., the day the governor signed Assembly Bill 1X 26) that the former RDA approved the first implementation agreement (FIA), in which UCP, with certain exceptions not relevant here, assumed all the rights and obligations of East Garrison Partners in the 2005 DDA. Under the terms of the FIA, the former RDA's duties with respect to the 2005 DDA did not change.

8

In January 2012, the County adopted a resolution stating its intent to serve as the successor agency to its former RDA upon dissolution of the former RDA. In February 2012, the former RDA was dissolved by operation of law and the County assumed all the rights, powers, assets, liabilities, duties, and obligations of its former RDA. (See *Matosantos*, 53 Cal.4th at pp. 250-251.)

*Disputed ROPS Claims*

For the six-month fiscal period ending in June 2016 (ROPS 15-16B), the Department disapproved two items proposed as enforceable obligations in the ROPS submitted by the County: (1) $408,490 for the building of public facilities for the East Garrison Project; and (2) $150,000 for administrative costs for the East Garrison Project. In disapproving the first item, the Department explained that while the 2005 DDA was a valid agreement that entitled the former RDA to assign it to a new developer due to a default by the initial developer, the FIA, which represented the former RDA's attempt to assign the 2005 DDA to a new developer, was invalid because it was entered into after the freeze component of the dissolution law took effect on June 28, 2011. The Department, however, noted that the County could assign the 2005 DDA to a new developer, as the 2005 DDA required the former RDA not to unreasonably withhold its consent to assign the agreement in the event of a default. The Department explained that any future assignment of the agreement must comply with the requirements of section 34181, subdivision (e); that is, the assigned agreement must increase the taxing entities' net revenues, decrease their liabilities, and be in their best interests (as determined by the oversight board). In disapproving the second item (i.e., the request for administrative costs), the Department provided the following explanation: "The [County] is claiming administrative costs for the [2005] DDA in the amount of $150,000 for ROPS 15-16B under Section 205 (1) of the [2005] DDA and DDA Attachment 4. However, these sections do not require the [County] to expend $300,000 annually for specific project costs. In fact, the administrative costs referred to in these sections refer to costs of

9

administering the Redevelopment Project Area as a whole. Thus, under this section the [County] is only entitled to actual annual costs associated with administering the Redevelopment Project Area. Under Dissolution Law, this cost is capped under the Administrative Cost Allowance. Thus, under the 2005 DDA the [County] is not entitled to $150,000 for each ROPS period in addition to the allowed ACA distribution."

For the one-year fiscal period ending in June 2017 (ROPS 16-17), the Department disapproved two items proposed as enforceable obligations in the ROPS submitted by the County: (1) $2,074,247 for the building of public facilities for the East Garrison Project; and (2) $300,000 for administrative costs for the East Garrison Project. The Department denied these items for the same reasons it denied the items in ROPS 15-16B. However, it noted, again, that the 2005 DDA could be assigned to a new developer provided that the assignment complied with the requirements of section 34181, subdivision (e).

*Writ Petition*

In June 2016, the County petitioned for a writ of mandate, claiming that the Department improperly disapproved legitimate enforceable obligations relating to the East Garrison Project in ROPS 15-16B and ROPS 16-17. According to the County, the effect of the Department's actions is to prohibit the County from receiving funds to fulfill its enforceable contractual obligations to UCP, which jeopardizes the completion of the East Garrison Project. Among other things, the County sought a writ of mandate (1) directing the Department to recognize the disapproved items on ROPS 15-16B and ROPS 16-17 as legitimate enforceable obligations, and (2) directing the Monterey County auditor-controller to distribute funds from the trust fund to allow the County to pay those obligations. In seeking this relief, the County claims that the Department erroneously concluded that the FIA does not constitute an enforceable obligation on the basis that the former RDA lacked the authority to enter into the agreement on the date the governor signed Assembly Bill 1X 26. The County requested a declaration that the FIA is an enforceable obligation.

10

*Amended and Restated First Implementation Agreement*

After the writ petition was filed, the County and UCP entered into the Amended and Restated First Implementation Agreement to the Disposition and Development Agreement (ARFIA) in August 2016. Under the terms of this agreement, UCP assumed, with certain exceptions not relevant here, the duties and obligations of East Garrison Partners under the 2005 DDA, and the County's financial commitment (i.e., amount of tax increment pledged) remained the same with one exception: the tax increment pledged to the East Garrison Project for affordable housing was reduced from a "not to exceed" amount of $9.5 million to a "not to exceed" amount of $8.5 million.

In September 2016, the oversight board approved the ARFIA, finding that it was "in the best interests of the affected taxing entities that the East Garrison Project be completed as soon as possible." In October 2016, the Department approved the ARFIA. In doing so, the Department concluded that the agreement complied with all the requirements of section 34181, subdivision (e).

*Amended ROPS Claim*

For the six-month fiscal period ending in June 2017, the County submitted an amended ROPS (ROPS 16-17B) pursuant to section 34177, subdivision (o)(1)(E). Relying on the newly approved ARFIA, the County requested $1,625,000 for the building of public facilities for the East Garrison Project, and $150,000 for administrative costs for the East Garrison Project. In November 2016, the Department approved the request for the building of public facilities but denied the request for administrative costs. In denying the request for administrative costs, the Department determined that this item was not an enforceable obligation.

*The Trial Court's Ruling*

In the trial court, the County argued that the Department improperly disapproved ROPS funding for public facilities related to the East Garrison Project on the ground that the FIA was void. The County further argued that the Department improperly

11

disapproved ROPS funding for administrative costs related to the East Garrison Project on the ground that such costs were not an enforceable obligation under the dissolution law. The trial court disagreed with the County, ruling that the FIA was not an enforceable obligation, since it was not entered into before the freeze component of Assembly Bill 1X 26 took effect on June 28, 2011.[6] The trial court also ruled that the County had failed to carry its burden to show that the Department abused its discretion in disapproving funds to pay for costs incurred to administer the East Garrison Project.

## DISCUSSION

### I

### *Standard of Review*

When, as here, the facts are undisputed, we independently review questions of statutory construction, contract interpretation, and constitutional law. (*City of San Jose v. Sharma* (2016) 5 Cal.App.5th 123, 134; *Petaluma, supra*, 238 Cal.App.4th at pp. 1438-1439.)

### II

### *Whether the FIA was an Enforceable Obligation*

The County contends the trial court erroneously determined that the FIA was not an enforceable obligation because it was not executed prior to the date the freeze

---

[6] The trial court rejected the Department's contention that the execution of the ARFIA rendered the issue of whether the FIA is an enforceable obligation moot, reasoning that the ARFIA altered the terms of the FIA by "reduc[ing] the amount of the potential enforceable obligation of the former RDA by $1 million to appease [the Department], and [the County] contends that [the Department] conditioned its approval of the future assignment of the 2005 DDA on a reduction of the pledge of tax increment through the [ARFIA]." As noted above, under the terms of the ARFIA, UCP largely assumed the duties and obligations of East Garrison Partners under the 2005 DDA, and the County's financial commitment to the East Garrison Project for affordable housing was reduced from a "not to exceed" amount of $9.5 million to a "not to exceed" amount of $8.5 million. On appeal, neither party challenges the trial court's mootness determination.

12

component of the dissolution law, Assembly Bill 1X 26, took effect. According to the County, the FIA is a valid and enforceable agreement because, even though it was entered into on the same date the governor signed Assembly Bill 1X 26, it was executed prior to the time the governor signed the law in the late afternoon on June 28, 2011. We disagree.

Assembly Bill 1X 26, which dissolved RDAs, appropriated $500,000 to the Department from the General Fund for administrative costs associated with the act and declared that it is a budget-related bill. (Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5, § 11.) Section 16 of the act provides: "This act is a bill providing for appropriations related to the Budget Bill within the meaning of subdivision (e) of Section 12 of Article IV of the California Constitution, has been identified as related to the budget in the Budget Bill, and shall take effect immediately." (Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5, § 16.) Thus, Assembly Bill 1X 26 became effective immediately upon gubernatorial signature on June 28, 2011. (*Grass Valley, supra,* 17 Cal.App.5th at p. 573; Cal. Const., art. IV, § 12, subd. (e)(1) ["the budget bill and other bills providing for appropriations related to the budget bill . . . take effect immediately upon being signed by the Governor or upon a date specified in the legislation"].)

As added by Assembly Bill 1X 26, section 34161 provides: "Notwithstanding Part 1 (commencing with Section 33000), Part 1.5 (commencing with Section 34000), Part 1.6 (commencing with Section 34050), and Part 1.7 (commencing with Section 34100), or any other law, *commencing on the effective date of this part*, no agency shall incur new or expand existing monetary or legal obligations except as provided in this part. All of the provisions of this part shall take effect and be operative on the effective date of the act adding this part." (Italics added.) Various other statutory provisions added by Assembly Bill 1X 26 specifically prohibit an agency from engaging in certain activities, "commencing on the effective date of this part." (See e.g., § 34162 [incur indebtedness]; § 34163, subd. (a) [make loans or enter into agreements to provide funds

13

or financial assistance to any entity or person]; § 34164 [engage in specified redevelopment activities].)  As part of the "clean-up" legislation enacted in June 2012, section 34177.3 was added to the Health and Safety Code.  (Stats. 2012, Reg. Sess. 2011-2012, ch. 26 § 12.)  This section expressly prohibits successor agencies from "creat[ing] new enforceable obligations or begin[ing] redevelopment work, except in compliance with an enforceable obligation . . . that *existed prior to June 28, 2011*."  (§ 34177.3, subd. (a), italics added.)

In *Big Bear Lake*, a panel of this court recently concluded that a contract between a city's former RDA and a private contractor for professional services related to several construction projects did not create an enforceable obligation because the contract, which was signed on June 28, 2011, was executed after the freeze component of the dissolution law took effect.  (*Big Bear Lake, supra,* 12 Cal.App.5th at p. 931.)

The County does not dispute that Assembly Bill 1X 26 took effect immediately upon gubernatorial signature.  Instead, the County insists that the FIA created an enforceable obligation because it was executed several hours before the governor signed the law.  In other words, the County urges us to conclude that Assembly Bill 1X 26 took effect at the precise moment it was signed by the governor, and therefore any contract entered into prior to that time, even if it was executed on the day the law took effect, created an enforceable obligation.  In the County's view, *Big Bear Lake* is distinguishable because the opinion does not discuss whether the contract at issue in that case was executed before or after the governor signed Assembly Bill 1X 26.  The County, however, has not cited any authority persuading us that its position is correct and our own research has located none.  Having reviewed the language of the dissolution law and finding no contrary intention expressed by the Legislature, we conclude that Assembly Bill 1X 26 was effective for the entire calendar day of June 28, 2011.  (See *Estate of Cirone* (1984) 153 Cal.App.3d 199, 202-203 [concluding that Proposition 6 applied for the entire day of its passage, reasoning that, in the absence of an expressed contrary

14

intent, when a Proposition indicates that it became operative from the "date of passage" it should be given its ordinary meaning of the entire day rather than the moment it was passed]; *Anderson v. State Personnel Bd.* (1980) 103 Cal.App.3d 242, 248 ["The word 'date' in its common and accepted statutory meaning refers simply to the day, month and year"].)

III

*Disputed ROPS Claims*

The County contends the Department erred in disapproving an item in ROPS 15-16B and ROPS 16-17 requesting funds to pay for the administration of the East Garrison Project. According to the County, the Department abused its discretion in disapproving these items because the Department previously determined that the 2005 DDA was an enforceable obligation and authorized the disbursement of money from the trust fund to pay for administrative costs. The County further argues that the Department erroneously relied on the "Administrative Cost Allowance," which limits the "amount of administrative costs that may be paid by a successor agency from the [trust fund] in a fiscal year" (§ 34171, subd. (b)(1))[7] in denying the challenged ROPS items. We find no basis for reversal.

---

[7] "The administrative cost allowance shall be 5 percent of the property tax allocated to the successor agency on the Recognized Obligation Payment Schedule covering the period January 1, 2012, through June 30, 2012. The administrative cost allowance shall be up to 3 percent of the property tax allocated to the Redevelopment Obligation Retirement Fund for each fiscal year thereafter ending on June 30, 2016. However, the administrative cost allowance shall not be less than two hundred fifty thousand dollars ($250,000) in any fiscal year, unless this amount is reduced by the oversight board or by agreement with the successor agency." (§ 34171, subd. (b)(2).) "Commencing July 1, 2016, and for each fiscal year thereafter, the administrative cost allowance shall be up to 3 percent of the actual property tax distributed to the successor agency by the county auditor-controller in the preceding fiscal year for payment of approved enforceable obligations, reduced by the successor agency's administrative cost allowance and loan repayments made to the city, county, or city and county that created the redevelopment

A.  *Additional Background*

As relevant here, the trial court's tentative decision stated:  "In response to [the Department's] denial of administration costs for the East Garrison Project, [the County] argues that [the Department] is erroneously 'picking and choosing' what parts of an enforceable obligation—in this case, the 2005 DDA—to fund.  [The County] claims that [the Department] is erroneously 'interpreting' the DDA by claiming in its ROPS denial that the DDA does not support a disbursement of monies for costs of administrative costs.  This argument is without merit.

"First, . . . [the County] has not supported its claim with further argument or citations to the administrative record, and has specifically excluded the pertinent parts of the 2005 DDA relevant to [the Department's] decision denying ROPS monies for administrative costs for the East Garrison Project.  [The County] has failed to meet its burden of showing that [the Department] abused its discretion.

"Moreover, [the County] has not shown that [the Department] is acting beyond what the Dissolution Law requires it to do.

"The Dissolution Law requires [the Department] to review and approve successor agencies' ROPS submissions to determine if the items for which the successor agency requests [trust fund] monies in a six-month period are enforceable obligations.  (Health & Saf. Code, §§ 34177, 34179, 34180.)

"An 'enforceable obligation' includes contracts and agreements such as the 2005 DDA.  (Health & Saf. Code, § 3417l(d)(l)(E).)  The Dissolution Law necessarily requires [the Department] to review documentation regarding the purported enforceable

---

agency that it succeeded pursuant to subdivision (b) of Section 34191.4 during the preceding fiscal year.  However, the administrative cost allowance shall not be less than two hundred fifty thousand dollars ($250,000) in any fiscal year, unless this amount is reduced by the oversight board or by agreement between the successor agency and the department."  (§ 34171, subd. (b)(3).)

16

obligation, e.g., the agreements entered between the parties and actions taken by the parties prior to or subsequent to the agreement, to determine if the scheduled payments thereunder qualify under the statutory definition of an enforceable obligation. Indeed, the Dissolution Law contains an annual administrative cost allowance, limiting the amount of monies successor agencies are entitled to receive via the ROPS process for administering the former RDA's activities. (Health & Saf. Code, 34171(b).) In fact, [the Department] referenced this provision of the Dissolution Law, when responding to the Successor Agency's request for the costs of administering the East Garrison Project pursuant to the 2005 DDA. However, [the County] chose not to discuss the import of this provision or its effect on the 2005 DDA.

"Thus, a successor agency's claim that an item is an enforceable obligation does not allow it to automatically receive [money from the trust fund], in the amount of its choosing to fund the purported enforceable obligation.

"[The County] cites *Marek v. Napa County Redevelopment Agency* (1988) 46 Cal.3d 1070, arguing that [the Department] has no discretion to look beyond a Successor Agency's claim that a contract requires a successor agency to expend a certain amount of monies in the ROPS process. *Marek* is distinguishable. *Marek* involved the County Auditor's disbursement of monies to a redevelopment agency pursuant to the redevelopment agency's statement of indebtedness. The Supreme Court held that 'indebtedness,' as it was used in the California Constitution and pertinent statutes, included RDAs' executory financial obligations under redevelopment contracts. However, in reaching its holding, the Court noted the provisions of the Community Redevelopment Law entitling the former RDA to monies were to be interpreted broadly, to allow the RDA to perform its obligations. Importantly, *Marek* was decided before all redevelopment agencies were dissolved. It did not address the situation here. In contrast, the Dissolution Law provides [the Department] with the authority to review requests for monies via the ROPS process. Such review necessarily entails review of the underlying

17

contract to determine whether an item is an enforceable obligation. *Marek* does not deprive [the Department] of its ability to review evidence of claimed enforceable obligations of a successor agency in the ROPS process.

"[The County] also finds fault with [the Department's] ROPS determination because [the Department] did not previously object to the Successor Agency's claim of administrative costs associated with administration of the East Garrison Project. However, [the Department's] failure to object in previous ROPS cycles does not prevent it from denying funds in future ROPS cycles. (See *City of Brentwood v. Campbell* (2015) 237 Cal. App.4th 488, 505 [(*Brentwood*)].) Indeed, [the Department's] ROPS letters to successor agencies contain this disclaimer. [Citation.]

"[The County] has shown no abuse of discretion by [the Department]."

Following oral argument, the trial court affirmed its tentative decision with the following modifications: "The parties did not satisfactorily address the import of Section 34171's administrative cost allowance. [The County] argued that Section 34171 pertained to administrative costs for all activities of the former RDA, not to a specific project, and that it was unfortunate that this statute and the 2005 DDA both referred to 'administrative costs.' [The Department] agreed that Section 34171 pertained to 'winding-down' the obligations of the former RDA, and that it does not use this statute to parse out what activities in a development agreement are for administrative costs and what are not. However, regardless of the import of the statute, the Court's conclusion in its tentative ruling is unaltered: the Dissolution Law necessarily requires [the Department] to review documentation, e.g. the 2005 DDA, supporting the claimed enforceable obligation in the ROPS process, and [the County] has shown no abuse of discretion by [the Department] here.

"Counsel for [the County] argued that because [the Department] approved the Oversight Board's approval of the Amended and Restated FIA in October 2016, pursuant to Section 34179, the 2005 DDA is an enforceable obligation, and the Successor Agency

18

is entitled to receive costs to administer the East Garrison Project via the ROPS process. The Court disagrees. [The Department's] approval of the Amended and Restated FIA did not have this effect. In fact, [the Department] expressly advises successor agencies in its letters responding to ROPS submissions that a Final and Conclusive determination is required to ensure future funding for a ROPS item: '[The Department's] determination is effective for this time period only and should not be conclusively relied upon for future ROPS periods. All items listed on a future ROPS are subject to review and may be denied even if it [*sic*] was not denied on this . . . [ROPS]. The only exception is for items that have received a Final and Conclusive determination from [the Department] pursuant to Section 34177.5(i). [The Department's] review of Final and Conclusive items is limited to confirming the scheduled payments as required by the obligation.' [Citation.]"

B. *Analysis*

We conclude the County has failed to carry its burden to affirmatively demonstrate error. The County initially contends that because the 2005 DDA is a valid agreement providing for payment of project specific costs up to a maximum of $300,000 annually, the Department abused its discretion in failing to approve its requests for administrative costs related to the East Garrison Project in ROPS 15-16B and ROPS 16-17. The County insists that the Department's refusal to honor some but not all terms of the 2005 DDA is "arbitrary and capricious because the Dissolution Act does not authorize the [Department] to parse out pieces of an enforceable obligation." We find the County's showing insufficient to establish error. The County, without citation to authority supporting such a conclusion, asserts that the Department must honor all the terms of the 2005 DDA because the agreement constitutes an enforceable obligation within the meaning of the dissolution law. To the contrary, the dissolution law requires the Department to review each ROPS submitted by a successor agency and determine whether the specific items identified by the successor agency in the ROPS qualify as enforceable obligations. (§ 34177, subds. (m)(1) & (o)(1).) We find no merit in the

19

County's attempt to show error by relying on the Department's past approvals of ROPS items requesting funds to pay for administrative costs related to the East Garrison Project. A panel of this court rejected a similar argument in *Brentwood*. In that case, the court explained, "[I]n its previous determination letters involving ROPS I to ROPS III, the Department each time informed Brentwood that past approvals would not prevent it from revisiting the validity of including an item on a future ROPS. If Brentwood had wanted an ironclad guarantee that approval of an enforceable obligation would be ongoing, it had the statutory remedy of petitioning the Department for a 'final and conclusive' determination of approval for subsequent payments for that enforceable obligation." (*Brentwood, supra*, 237 Cal.App.4th at pp. 504-505.) Finally, contrary to the County's suggestion, the Department's mere approval of ARFIA as a valid assignment of the 2005 DDA after this litigation commenced does not establish that the Department erroneously disapproved funding for the ROPS items at issue in this appeal.

We decline to reach the County's contention that reversal is required because the Department improperly relied on the administrative cost allowance in disapproving the challenged ROPS items. According to the County, the Department erroneously concluded that the East Garrison Project specific costs are capped by the administrative cost allowance. However, because this argument was not properly raised and developed in the trial court, it was not preserved for appellate review. A fundamental principle of appellate procedure is that " 'a reviewing court will ordinarily not consider claims made for the first time on appeal which could have been but were not presented to the trial court. [Citation.]' " (*Perez v. Grajales* (2008) 169 Cal.App.4th 580, 591.) Appellate courts will " 'ignore arguments, authority, and facts not presented and litigated in the trial court.' [Citation.] Such arguments raised for the first time on appeal are generally deemed forfeited." (*Id.* at pp. 591-592; see also *McClain v. Octagon Plaza, LLC* (2008) 159 Cal.App.4th 784, 805, fn. 9 [an argument raised for the first time on appeal is

20

forfeited].)  The argument the County makes was not briefed below or raised at oral argument and ruled on by the trial court.

IV

*Impairment of Contract*

Finally, we reject the County's contention that the Department's application of the dissolution law to the 2005 DDA improperly impaired the contractual rights of UCP, a private developer.  As an initial matter, because the County never raised this contention below, it has been forfeited on appeal.  (*Perez v. Grajales, supra,* 169 Cal.App.4th at pp. 591-592; see also *McClain v. Octagon Plaza, LLC, supra,* 159 Cal.App.4th at p. 805, fn. 9.)  In any event, the claim fails on the merits.  We have repeatedly held that a public entity does not have the right to raise the purported contractual rights of other entities. (See, e.g., *Grass Valley, supra,* 17 Cal.App.5th at p. 593; *Brentwood, supra,* 237 Cal.App.4th at pp. 503-504.)

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to defendants.  (See Cal. Rules of Court, rule 8.278 (a).)**8**

_____/s/_____
Duarte, J.

We concur:

_____/s/_____
Blease, Acting P. J.

_____/s/_____
Butz, J.**\***

_____

**8**  We deny the pending request for judicial notice because the proffered material is unnecessary to our decision.  (*Grass Valley, supra,* 17 Cal.App.5th at pp. 594, fn. 13.)  We also deny the County's pending request to strike portions of the respondent's brief that reference a case ordered depublished by our Supreme Court.  We note the County first cited that case in its briefing; the Department was merely responding and noting the case's subsequent depublication.  Further, we are capable of ignoring an opinion that is not citable authority.   (Cal. Rules of Court, rule 8.1115.)

**\***  Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| COUNTY OF MONTEREY, as Successor Agency, etc., | C085041 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2016-80002403-CU-WM-GDS) |
| v. | |
| KEELY BOSLER, as Director, etc. et al., | ORDER GRANTING PARTIAL PUBLICATION AND DENIAL OF PETITION FOR REHEARING |
| Defendants and Respondents; | |
| UCP EAST GARRISON LLC et al., | |
| Real Parties in Interest and Respondents. | |

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts III and IV.

It is hereby ordered:

1.    The opinion in the above-entitled matter filed October 20, 2020, was not certified for publication in the Official Reports.  For good cause it now appears the opinion should be published in the Official Reports, and it is so ordered.

Appellant's petition for rehearing is denied.

FOR THE COURT:


_____/s/_____
Blease, Acting P. J.


_____/s/_____
Duarte, J.


_____/s/_____
Butz, J.*


_____

* Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

2

EDITORIAL LISTING

APPEAL from a judgment of the Superior Court of Sacramento County, Shelleyanne Wai Ling Chang, Judge.  Affirmed.

Charles J. McKee, County Counsel, and Brian P. Briggs, Deputy County Counsel, for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Thomas S. Patterson, Senior Assistant Attorney General, Benjamin M. Glickman, Supervising Deputy Attorney General, and Anthony P. O'Brien, Deputy Attorney General for Defendants and Respondents.