Filed 7/30/15

CERTIFIED <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF PETALUMA et al., | C075812 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2013-80001459-CU-WM-GDS) |
| v. | |
| MICHAEL COHEN, as Director, etc., | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Sacramento County, Eugene L. Balonon, Judge. Affirmed.

Burke, Williams & Sorensen, J. Leah Castella and Megan A. Burke, for Plaintiffs and Appellants.

Kamala D. Harris, Attorney General, Douglas J. Woods, Senior Assistant Attorney General, Mark R. Beckington, Supervising Deputy Attorney General, George Waters and Ryan W. Marcroft, Deputies Attorney General, for Defendant and Respondent.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II of the discussion.

1

A few months before the 2011 enactment of legislation leading to the "Great Dissolution" of California's redevelopment agencies,[1] the Petaluma Community Development Commission issued bonds to fund certain projects. The Commission was the redevelopment agency (Agency) for the City of Petaluma (City), and the newly funded projects included an interchange and roadway under-crossing of U.S. Highway 101 (the Rainier Project).

The City, as successor to the Agency, submitted various recognized obligation payment schedules (ROPS) that included expenditures of bond proceeds for the Rainier Project.[2] The Department disapproved certain of these expenditures because they were pursuant to contracts to which the Agency was not a party. The City brought a petition for a writ of mandate, seeking an order to require the Department to approve these expenditures. The trial court denied the petition.

On appeal, the City contends the Department abused its discretion in disapproving ROPS items relating to the use of bond proceeds for the Rainier Project. It contends the 2011 bonds are enforceable agreements that require the proceeds be spent on specified projects, including the Rainier Project. The City argues the Department's refusal to approve these expenditures is an unconstitutional impairment of contracts. Focusing on what it believes will be the *result* of the Department's action, defeasance of the bonds,[3]

---

[1] See *City of Pasadena v. Cohen* (2014) 228 Cal.App.4th 1461, 1462.

[2] As part of the dissolution of redevelopment agencies, the 2011 legislation requires a successor agency to submit a ROPS to the Department of Finance (Department) which approves or disapproves items on the ROPS. (Health & Saf. Code, § 34177, subd. (a); all undesignated statutory references are to this code.)

[3] "Defeasance occurs when the issuer makes other arrangements to pay the bonds. This is done by placing in a special trust fund, called an escrow fund, sufficient securities to pay the interest and principal on the bonds as they come due. Almost always, the securities placed in the trust account are United States treasury securities, but very occasionally other securities are used instead. Future interest and principal payments on

2

the City contends the Department had no authority to order defeasance and abused its discretion in failing to defer to the City and its oversight board on the decisions relating to the bonds.

As we will explain, although the bonds at issue are enforceable obligations, no enforceable obligation to use those bond proceeds *specifically to fund the Rainier Project* appears in the record. Accordingly we shall affirm, holding in the published portion of our opinion that the Department did not abuse its discretion in disapproving ROPS items relating to the Rainier Project. In the unpublished portion of our opinion, Part II of the Discussion, *post*, we conclude that the City's remaining contentions also fail.

## BACKGROUND

*The Law Dissolving Redevelopment Agencies*

"In the aftermath of World War II, the Legislature authorized the formation of community redevelopment agencies in order to remediate urban decay. [Citations.] The Community Redevelopment Law 'was intended to help local governments revitalize blighted communities.' [Citations.] It has since become a principal instrument of economic development, mostly for cities, with nearly 400 redevelopment agencies now active in California." (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 245-246 (*Matosantos*).) Redevelopment agencies used a tax increment funding method. "Under this method, those public entities entitled to receive property tax revenue in a redevelopment project area (the cities, counties, special districts, and school districts containing territory in the area) are allocated a portion based on the assessed value of the property prior to the effective date of the redevelopment plan. Any tax revenue in excess of that amount—the tax increment created by the increased value of project area property—goes to the redevelopment agency for repayment of debt incurred

the bonds are made by the trustee from the escrow fund; the issuer no longer makes the payments." (Zipf, How Municipal Bonds Work (1995) ch. 3, pp. 44-45.)

3

to finance the project. [Citations.] In essence, property tax revenues for entities other than the redevelopment agency are frozen, while revenue from any increase in value is awarded to the redevelopment agency on the theory that the increase is the result of redevelopment. [Citation.]" (*Id.* at pp. 246-247.)

Over time, "a perception had grown that some redevelopment agencies were used as shams to divert property tax revenues that otherwise would fund general local governmental services, and legislative efforts were made to address these concerns. [Citations.]" (*City of Emeryville v. Cohen* (2015) 233 Cal.App.4th 293, 298 (*Emeryville*).) These concerns grew as the State's financial condition worsened. "Responding to a declared state fiscal emergency," in the summer of 2011 the Legislature enacted legislation (Assem. Bill No. 26 (2011-2012 1st Ex. Sess.) enacted as Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5X (Assembly Bill 1X 26)) that "bars redevelopment agencies from engaging in new business and provides for their windup and dissolution." (*Matosantos, supra,* 53 Cal.4th at p. 241.)

Assembly Bill 1X 26 consists of two principal components, codified as new parts 1.8 and 1.85 of division 24 of the Health and Safety Code.[4] "Part 1.8 (§§ 34161 to 34169.5) is the 'freeze' component: it subjects redevelopment agencies to restrictions on new bonds or other indebtedness; new plans or changes to existing plans; and new partnerships, including joint powers authorities (§§ 34162 to 34165). Cities and counties are barred from creating any new redevelopment agencies. (§ 34166.) Existing obligations are unaffected; redevelopment agencies may continue to make payments and perform existing obligations until other agencies take over. (§ 34169.) Part 1.8's purpose is to preserve redevelopment agency assets and revenues for use by 'local governments to

---

[4] In June 2012, the Legislature enacted "clean-up" legislation to Assembly Bill 1X 26 (Assembly Bill No. 1484, Stats. 2012, ch. 26). Together these laws are referred to as the dissolution law.

4

fund core governmental services' such as fire protection, police, and schools. (§ 34167, subd. (a).)

"Part 1.85 (§§ 34170 to 34191) is the dissolution component. It dissolves all redevelopment agencies (§ 34172) and transfers control of redevelopment agency assets to successor agencies, which are contemplated to be the city or county that created the redevelopment agency (§§ 34171, subd. (j), 34173, 34175, subd. (b)). Part 1.85 requires successor agencies to continue to make payments and perform existing obligations. (§ 34177.) However, unencumbered balances of redevelopment agency funds must be remitted to the county auditor-controller for distribution to cities, the county, special districts, and school districts in proportion to what each agency would have received absent the redevelopment agencies. (See §§ 34177, subd. (d), 34183, subd. (a)(4), 34188.)" (*Matosantos, supra,* 53 Cal.4th at pp. 250-251.)

Under the dissolution law, all redevelopment agencies and redevelopment agency components of community development agencies were to be eliminated. (§ 34172, subd. (a)(1).) "[A]ll authority, rights, powers, duties, and obligations previously vested with the former redevelopment agencies, under the Community Redevelopment Law, are hereby vested in the successor agencies." (§ 34173, subd. (b).) Here, the City acts as successor agency to the Agency. (§§ 34171, subd. (j), 34173.) The successor agency is obligated to "[e]xpeditiously wind down the affairs of the redevelopment agency" under "the direction of the oversight board." (§ 34177, subd. (h).) The oversight board consists of appointed members and has "fiduciary responsibilities to holders of enforceable obligations." (§ 34179, subd. (i), *id.*, subd. (a).) Enforceable obligations include bonds and any payments required under the indenture (§ 34171, subd. (d)(1)(A)), but exclude any agreements or contracts between the city that created the redevelopment agency and the former redevelopment agency (*id.*, subd. (d)(2)).

5

The successor agency prepares a ROPS for each six-month fiscal period, setting forth the minimum payment amounts for enforceable obligations, and the ROPS must be approved by the oversight board. (§§ 34171, subds. (g) & (h), 34177, subd. (*l*)(1).) The ROPS is also submitted to the Department and the California State Controller, who have authority to require documentation relating to any enforceable obligation. (§ 34177, subds. (*l*)(2)(C) & (a)(2).) The Department then makes "its determination of the enforceable obligations and the amounts and funding sources of the enforceable obligation." (*Id.*, subd. (m).) In addition, the Department has authority to review actions of the oversight board and to eliminate or modify any item on a ROPS. (§ 34179, subd. (h).) A successor agency or oversight board cannot restore funding for an enforceable obligation that was reduced or deleted by the Department, unless the restoration reflects decisions made during a meet and confer process with the Department or a court order. (§ 34178, subd. (a).)

Each county auditor-controller takes the property tax proceeds (the tax increment) that would have gone to the former redevelopment agency and places such money in a redevelopment property tax trust fund (the trust fund). (§ 34172, subd. (d).) Money in the trust fund is used to pay the former redevelopment agency's required contributions to schools, enforceable obligations approved on a ROPS, and administrative costs. (§ 34183, subd. (a).) Any remaining money is distributed to local taxing entities. (§ 34183, subd. (a)(4).)

*The Rainier Project*

The Rainier Project will extend Rainier Avenue to the west of U.S. Highway 101 by means of an undercrossing of the highway. The project is part of a larger project to widen the highway in Sonoma County to handle increased population. In January 2010, the City and the Agency each adopted resolutions to proceed with project studies and environmental documents for the Rainier Project. The Agency was to contribute $3,000,000 to the City for the project.

6

That spring, the City had entered into two agreements relating to the Rainier Project. The first was a professional services agreement with Metropolitan Planning Group, Inc., for $23,100, to provide planning assistance and coordination. The second was a professional design services agreement with URS Corporation Americas, an engineering consultant, for $856,149, to prepare an environmental impact report and other services. Both agreements were to terminate on December 31, 2012.

In January 2011, the City and the Agency entered into a cooperative agreement to provide for the Agency's financing of certain redevelopment projects. The Agency agreed to pay the City over $8,000,000 for the construction of the Rainier Project.

In March 2011, shortly before Assembly Bill 1X 26 was enacted, the Agency issued $11,369,000 in Series 2011 Bonds. The Series 2011 Bonds were tax increment bonds and secured by a pledge of and first lien on certain tax revenues relating to the funded projects. JP Morgan Chase Bank, N.A., was the original purchaser of all the bonds. The Series 2011 Bonds were issued "for the purpose of providing funds to finance Qualified Redevelopment Projects with respect to the Project Areas." The bulk of the Series 2011 Bonds ($7 million) were to be used to finance the Rainier Project.

In June 2011, the City entered into an amendment to a cooperative funding agreement with the Sonoma County Transportation Authority (SCTA). Under this amendment the City was to provide $498,000 for PS&E (plans, specifications, & estimates) and up to $7,000,000 for the construction phase of the Rainier Project.

*Disputed ROPS Claims*

The oversight board to the successor agency to the Agency approved three different ROPS for the six-month periods ending June 30, 2012 (ROPS I), December 31, 2012 (ROPS II), and June 30, 2013 (ROPS III). The Department disapproved various items as not qualifying as enforceable obligations on each ROPS. As relevant here, the Department disapproved the cooperative agreement between the City and the Agency on all three ROPS. On ROPS I, the Department disapproved items relating to the agreement

7

between the City and SCTA.  On ROPS III, the Department found the three agreements relating to the Rainier Project discussed above (URS Corp., Metropolitan Planning Group, and SCTA) were not enforceable obligations because the Agency was not a party to the agreements.[5]

The City requested a meet and confer session as to ROPS III.  After further review following the meet and confer session, the Department continued to deny the items related to the Rainier Project, finding they did not qualify as enforceable obligations.

*Writ Petition*

The City petitioned for a writ of mandate, claiming the Department abused its discretion in disqualifying legitimate enforceable obligations relating to the Rainier Project on ROPS I and III.  The City framed the issue as whether "the Successor Agency should be compelled to renege on financial commitments made by Petaluma's former redevelopment agency . . . to the City and other private and public third parties, such as the [SCTA], to expend tax increment funds and bond proceeds to assist with funding of a crucial highway infrastructure improvement, . . . which is a component of long-established and multi-party funded arrangements for the widening of U.S. Highway 101 through Sonoma County."

The City sought a writ of mandate directing the Department to reinstate and recognize items on ROPS I and III related to the Rainier Project as enforceable obligations, and directing the Sonoma County Auditor-Controller to distribute funds from the trust fund to permit the City (as successor agency) to pay the items on ROPS I, II, and III relating to the Rainier Project.

---

[5] The Department had not disapproved these agreements on ROPS I [items 3-5] or ROPS II [items 3-5].  The Department explains:  "On early ROPS, the Department had resources to review only a limited number of items. . . .  The Department informed successor agencies that it retained the right to remove an item from future ROPS, even if it was not disallowed on a previous ROPS."

The trial court denied the petition. The court found the agreements at issue were not enforceable obligations because the Agency was not a party to them, as required under the dissolution law. It next found resolutions of the City and the Agency regarding funding of the Rainier Project were not enforceable obligations.[6] Finally, the court found the issuance of the bonds did not create an enforceable obligation to use the bond proceeds to fund the Rainier Project.

## DISCUSSION

### I

### *Whether Use of Bond Proceeds for the Rainier Project is an Enforceable Obligation*

The City contends the Department abused its discretion in denying the items on ROPS III relating to the Rainier Project. The City contends the Series 2011 Bonds are enforceable obligations and the terms of the indenture and the first supplement to indenture (Supplement) require that the proceeds of the bonds be spent on qualified redevelopment projects, one of which is the Rainier Project.[7]

---

[6] The City has not raised these first two points on appeal. In fact, the City concedes that its agreements with third parties are not enforceable obligations.

[7] Only the Supplement and the use certificate are part of the record on appeal, not the 2007 indenture or the bond purchase agreement (BPA). This court denied the City's request for judicial notice of the 2007 indenture, BPA, and several other items and struck the City's original opening brief that made numerous references to those documents. The City then requested this court take additional evidence under Code of Civil Procedure section 909 by considering the 2007 indenture; we denied the request. On appeal, the City urges that we reconsider our decision and take judicial notice of the 2007 indenture and the BPA.

"Reviewing courts generally do not take judicial notice of evidence not presented to the trial court. Rather, normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' [Citation.]" (*Vons Companies, Inc. v. Seabest Foods, Inc.*, (1996) 14 Cal.4th 434, 444, fn. 3.) Only exceptional circumstances justify

9

Resolution of this issue requires interpretation of both the dissolution law and the Supplement. "[W]here the issue is one of statutory construction or contract interpretation, and the evidence is not in dispute, the de novo standard of review applies [citation]." (*People v. International Fidelity Ins. Co*. (2010) 185 Cal.App.4th 1391, 1395.)

Section 34171, subdivision (d)(1)(A) defines an "enforceable obligation" to include bonds, "including the required debt service, reserve set-asides, and other payments required under the indenture or similar documents governing the issuance of the outstanding bonds of the former redevelopment agency." Section 12.02 of the Supplement provides it "constitutes a continuing agreement" to "secure the full payment when due of principal of and premium, if any, and interest on all Series 2011 Bonds." Certainly, repayments to the bondholders are enforceable obligations. Indeed, the dissolution law provides that in allocating moneys in the trust fund, first priority shall be given to debt service payments on tax allocation bonds. (§ 34183, subd. (a)(2)(A).) The question here is whether use of the bond proceeds to make payments on the various contracts relating to the Rainier Project--contracts to which the Agency was *not* a party-- are "payments required under the indenture."

---

deviation from that rule, either by taking judicial notice or exercising the power to take evidence under Code of Civil Procedure section 909. (*Ibid*.)

"California Rules of Court, rule 23(b) and Code of Civil Procedure section 909 authorize the appellate court to take evidence relating to any facts occurring at any time prior to appeal. However, the rule does not contemplate the reviewing court should take original evidence to reverse a judgment (*First Nat. Bank v. Terry* (1930) 103 Cal.App. 501, 509) and is *not available where there is no good cause shown for the unavailability of the evidence below*." (*DeYoung v. Del Mar Thoroughbred Club* (1984) 159 Cal.App.3d 858, 863, fn. 3, italics added.) Here the City has not shown good cause for us to consider evidence not presented to the trial court in our review of its judgment. We decline to reconsider our previous rulings. Accordingly, our review of bond documents is limited to the Supplement and the use certificate.

A. *Language of Supplement*

Section 12.02 of the Supplement provides that the Series 2011 Bonds have been issued "for the purpose of providing funds to finance Qualified Redevelopment Projects with respect to the Project Areas." Ten million dollars of the sale proceeds are to be deposited into the Series 2011 project account. The certificate regarding use of proceeds states the proceeds of the Series 2011 Bonds "will be used to finance Qualified Redevelopment Projects" as defined in an exhibit "and are expected to be funded in accordance with the estimated draw-down schedule" set forth in the exhibit. The exhibit identifies two projects: the Old Redwood Highway Interchange Project with an estimated draw-down of $3 million, and the Rainier Project with an estimated draw-down of $7 million.

These provisions limit the use of the bond proceeds to the identified projects. Contrary to the City's argument, however, nothing in the language requires that the Rainier Project actually be funded or constructed. Unlike the express agreement to pay principal and interest, there is no *commitment* to build the Rainier Project. As the trial court found, the Supplement requires only that if the bond proceeds are used, they must be used for the identified projects. It does not separately mandate that the identified projects be built. Whether the 2007 indenture has other requirements regarding the use of bond proceeds we cannot say because it is not part of the record. "As a reviewing court, we usually consider only matters that were part of the record when the judgment was entered. [Citation.]" (*Ragland v. U.S. Bank National Assn.* (2012) 209 Cal.App.4th 182, 195.)

The City relies on section 34177, subdivision (i), which provides that successor agencies are required to, "Continue to oversee development of properties until the contracted work has been completed or the contractual obligations of the former redevelopment agency can be transferred to other parties. Bond proceeds shall be used for the purposes for which the bonds were sold unless the purposes can no longer be

11

achieved, in which case, the proceeds may be used to defease the bonds." In interpreting different provisions of a statute, "we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part . . . ." (*Curle v. Superior Court* (2001) 24 Cal.4th 1057, 1063.) Section 34177 details the obligations of the successor agency; it does not define "enforceable obligations." We do not read this provision on the duties of a successor agency to enlarge and supersede the specific definition of an enforceable obligation in section 34171. (See *Estate of Kramme* (1978) 20 Cal.3d 567, 576 [principle that specific statute controls and takes priority over a general statute encompassing the same subject].) Here, the purpose for which the Series 2011 Bonds were sold "can no longer be achieved" because it is prohibited by the enactment of the dissolution law. Therefore, there is no violation of section 34177, subdivision (i).

The City also contends that the Supplement requires the proceeds to be used to fund the Rainier Project because it requires that the tax-exempt status of the bonds be maintained.[8] The City fails to point to a specific provision in the Supplement containing this requirement. Instead, it reads in the requirement to maintain tax-exempt status because the failure to do so results in a severe penalty. If interest on the bonds is determined to be taxable, the interest rate on the bonds will be increased or "grossed up." The City complains the cost of the interest gross-up plus other fines and fees will be about $1.8 million.

The Department dismisses this concern as "speculative and irrelevant." We are not as dismissive; we recognize the City may face significant expenses as a result of the

---

[8] The City also points to section 34169, subdivision (b) which requires a redevelopment agency, until a successor agency is authorized, to preserve the tax-exempt status of interest payable on outstanding agency bonds. Here, we are concerned with approval of items on a ROPS submitted by a successor agency, so section 34169 is inapplicable.

Department's disapproving the Rainier Project contracts as enforceable expenses that may be paid with bond proceeds. The City, however, has not established that the Department's action will result in loss of the bonds' tax-exempt status and implementation of the interest "gross-up" provision. Whatever the result, the interest rate penalty provision, however severe, does not compel us to conclude that the parties to the Supplement intended to create a binding obligation to fund and construct the Rainier Project. Rather, the penalty provision indicates the parties were cognizant of the possibility that the interest on the bonds might lose its tax-exempt status, because the bond proceeds would not be used as originally contemplated or otherwise, and provided for a remedy in that case.[9] The parties contemplated and provided for other changes from the original plan, such as the provision for mandatory defeasance in section 12.13 of the Supplement.

The City has failed to establish that the language of the Supplement creates a binding obligation on the Agency and its successor to fund the Rainier Project with the bond proceeds.

B. *Violation of the Covenant of Good Faith*

The City contends that the Department's refusal to allow it to spend the proceeds of the Series 2011 Bonds on contracts relating to the Rainier Project puts it--the successor agency--in breach of the covenant of good faith. The City argues the law in place at the time the bonds were issued assumed the bond proceeds would be used to finance qualified projects as defined in the indenture and Supplement, including the Rainier Project, and such use was necessary to provide proper security for the bonds because

---

[9] As the Department notes, the parties were on notice of possible significant changes in redevelopment agency financing. In January 2011, Governor Brown proposed eliminating redevelopment agencies entirely and bills were introduced to accomplish the elimination and winding down of redevelopment agencies. (*Matosantos, supra,* 53 Cal.4th at p. 250.) The Series 2011 Bonds were issued in March 2011.

their repayment was dependent upon increased property taxes generated by the redevelopment projects. The failure to use the bond proceeds for the Rainier Project will undermine the security of the bonds and create a risk of default. Thus, the City concludes, there was a "clear intent of the parties to have the bond proceeds spent in furtherance of the Qualified Projects" and the Department's refusal to permit the bond proceeds to be spent on the Rainier Project violates the covenant of good faith.

"It has long been recognized, of course, that every contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract such that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract. [Citation.] The Supreme Court has clarified, however, that an implied covenant of good faith and fair dealing cannot contradict the express terms of a contract. [Citation.]" (*Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 55.)

The City contends the failure to use bond proceeds to fund the Rainier Project will result in the loss of tax-exempt status and defeasance of the bonds. Since these two potential consequences are expressly provided for in the Supplement, actions that result in either or both will not violate the covenant of good faith. Consideration of the covenant of good faith and fair dealing does not establish that using the bond proceeds for the Rainier Project is an enforceable obligation.

C. *Unconstitutional Impairment of Contract*

The City contends the failure to use the proceeds of the Series 2011 Bonds for the Rainier Project results in an unconstitutional impairment of contract because it impairs the security of the bonds.

"The contract clauses of the federal and state Constitutions limit the power of a state to modify its own contracts with other parties, as well as contracts between other parties. [Citations.]" (*Board of Administration v. Wilson* (1997) 52 Cal.App.4th 1109, 1130.) An unconstitutional impairment of contract may arise when a portion of a

14

bondholder's security is removed. (*Goodman v. City of Riverside* (1983) 140 Cal.App.3d 900, 910.) To establish an unconstitutional impairment of contract, a party must present facts showing a "present, specific and substantial impairment of contract attributable" to the change in the law. (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 241 (*Amador Valley*).)

The City's argument fails for two reasons. First, it has failed to make the required factual showing of a "present, specific and substantial impairment." Second, the City's argument relates to a possible impairment of the *bondholders'* rights under the Series 2011 Bonds, and the City is not a bondholder. Thus, "it is doubtful that petitioners possess the requisite standing to assert the invalidity of [Assembly Bill 1X 26] on impairment of contract grounds. [Citations.] As expressed in an earlier case, '. . . no obligation of any contract with the appellant has been impaired, and in the absence of a showing of injury on its part, it may not be heard.' [Citation.]" (*Amador Valley, supra,* 22 Cal.3d at p. 242.)

D. *Conclusion*

On the record before us, the City has failed to show that funding the Rainier Project with the proceeds of the Series 2011 Bonds is an enforceable obligation under the dissolution law. Nor has the City shown that failure to so use the proceeds of the Series 2011 Bonds results in a breach of the covenant of good faith and fair dealing or an unconstitutional impairment of contract.

We recognize that the result in this case may cause financial hardship to the City and delay a worthwhile infrastructure improvement. It may be that the result would have been different had companion legislation to Assembly Bill 1X 26, permitting redevelopment agencies to continue to operate under certain circumstances, not been declared invalid by our Supreme Court in *Matosantos*. (*Id.* at pp. 264-270.) However, we must decide this issue by applying extant law. Further, in some circumstances, the City's reentry into certain agreements might also have led to a more favorable result.

15

(See § 34178, subd. (a); *Emeryville, supra,* 233 Cal.App.4th 293; *County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42.) Those circumstances, however, are not before us. Thus we find no error in the trial court's ruling that there was no enforceable obligation.

II

*The City's Remaining Contentions*

The City's remaining two contentions challenge the Department's action in disapproving ROPS items relating to the Rainier Project from a different perspective. The City asserts that as a result of the Department's action, the Series 2011 Bonds must be defeased because they cannot be redeemed until May 2018. It contends the Department has no authority to order defeasance. The City further contends the Department must defer to the successor agency and the oversight board as to how to comply with the bond agreements.

Both arguments fail because both are premised on the City's contention that the Supplement created an enforceable obligation to fund the Rainier Project with the Series 2011 Bond proceeds. The City argues that the "Dissolution law vests the Successor Agency and the Oversight Board--not DOF--with the authority to choose how to perform *an enforceable obligation*" and "the Dissolution Law vests the Successor Agency and the Oversight Board--not the Department of Finance--with the authority to determine how best to comply with *an enforceable obligation* like the Bond Agreements." (Italics added.) We have rejected the City's argument that the Supplement created an enforceable obligation; without that factual predicate, the remaining two contentions fail.

Section 34191.4 provides that after a successor agency has received a "finding of completion" (a partial windup requiring payment of certain sums to local taxing entities), "[b]ond proceeds derived from bonds issued on or before December 31, 2010, shall be used for the purposes for which the bonds are sold." (§ 34191.4, subd. (c)(1).) These bond proceeds may be used "in a manner consistent with the original bond covenants" even if such expenditures are not enforceable obligations. (§ 34191.4, subd. (c)(2)(A).)

16

The City urges that this subdivision does not prevent the use of proceeds from bonds issued after 2010 for the purposes for which the bonds were sold. We need not address the scope of this subdivision and what it prevents as the City has failed to point to any statutory authority that allows a successor agency to spend proceeds of a post-2010 bond issued by a former redevelopment agency on *anything* other than an enforceable obligation. As discussed, the City's proposed expenditures relating to the Rainier Project are not enforceable obligations.

As to the scope of the Department's authority, it has express authority to eliminate any item on a ROPS. (§ 34179, subd. (h).) That is what the Department did here, and the City has failed to establish any abuse of discretion in this action of the Department. The Department did not exceed its statutory authority.

The City contends the result in this case is inconsistent with the purpose of the dissolution law, which it asserts, without citation to authority, is to maximize value for the taxing entities.[10] In making our decision, we looked to the plain meaning of the statute and the provisions of the Supplement. "When statutory language is clear, a court may not add to or alter it to accomplish a purpose that does not appear on the face of the statute or from its legislative history. [Citation.]" (*Redevelopment Agency v.*

---

[10] The Legislature declared its intent to: "(1) Bar existing redevelopment agencies from incurring new obligations, prior to their dissolution. [¶] (2) Allocate property tax revenues to successor agencies for making payments on indebtedness incurred by the redevelopment agency prior to its dissolution and allocate remaining balances in accordance with applicable constitutional and statutory provisions. [¶] (3) Beginning October 1, 2011, allocate these funds according to the existing property tax allocation within each county to make the funds available for cities, counties, special districts, and school and community college districts. [¶] (4) Require successor agencies to expeditiously wind down the affairs of the dissolved redevelopment agencies and to provide the successor agencies with limited authority that extends only to the extent needed to implement a winddown of redevelopment agency affairs." (Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5X, § 1(j).)

17

*International House of Pancakes, Inc*. (1992) 9 Cal.App.4th 1343, 1352.)  The supposed intent of the Legislature cannot trump the words of the statute.

## DISPOSITION

The judgment is affirmed.  The Department shall recover costs on appeal.  (See Cal. Rules of Court, rule 8.278(a)(1) &(2).)


                                                           DUARTE           , J.


We concur:


MAURO         , Acting P. J.


HOCH         , J.