Filed 9/25/25

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| PACIFIC BELL TELEPHONE COMPANY et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF VENTURA et al., <br><br> Defendants and Respondents. | 2d Civ. No. B337518 <br> (Super. Ct. No. 2023CUMC015383) <br> (Ventura County) |

Appellants Pacific Bell Telephone Company, AT&T Mobility LLC, AT&T Corp., Sprint Communications Company, L.P., Sprint Spectrum, L.P., T-Mobile West LLC, and CenturyLink Communications, LLC (collectively Appellants) are utility companies operating in the State of California, including the County of Ventura (the County). Appellants sued the County and the Board of Equalization (the Board)[1] seeking a partial

---

[1] The Board is a defendant in the lawsuit pursuant to Revenue and Taxation Code section 5146, but no cause of action

refund on property taxes because they were taxed at a higher rate than other nonutility property (common property).  They contend that an alleged property tax rate disparity violates section 19 of article XIII of the California Constitution (article XIII, section 19).  The trial court sustained the County's demurrer.

We do not write on a blank slate.  Several of our colleagues in districts across the state have decided the same issue against Appellants.  (*County of Santa Clara v. Superior Court* (2023) 87 Cal.App.5th 347 (*Santa Clara*); *Pacific Bell Telephone Co. v. County of Merced* (2025) 109 Cal.App.5th 844 (*Merced*); *Pacific Bell Telephone Co. v. County of Placer* (2025) 111 Cal.App.5th 634 (*Placer*); *Pacific Bell Telephone Co. v. County of Napa* (2025) 112 Cal.App.5th 952 (*Napa*).)  We agree with these courts and affirm.

FACTUAL AND PROCEDURAL HISTORY[2]

Both utility and common property are subject to "ad valorem" property taxes, which are taxes imposed based on

---

was alleged against it.

[2] Appellants requested judicial notice of 30 exhibits, including materials related to the legislative history for article XIII, section 19, legislative documents related to Revenue and Taxation Code section 100, materials relating to article XIII, section 1 of the California Constitution, ballot materials relating to Proposition 13, briefs and other documents in other cases, and excerpts from dictionaries.  We grant judicial notice of Appellant's first request for judicial notice of exhibits 1–14 and 21–22.  We also grant Appellants' second request for judicial notice of exhibits 1, 2, 5, 7, and 8.  We deny judicial notice of the other exhibits because they are not relevant or necessary to our resolution of this appeal.  (*San Diego City Firefighters, Local 145 v. Bd. of Admin. of San Diego City Emples. Ret. Sys.* (2012) 206

assessed property value.  (*Merced, supra*, 109 Cal.App.5th at p. 850, fn. 1.)  Most common property, including real property, is locally assessed and taxed.  In contrast, utility property is "[s]tate-assessed" by the Board under the principle of unit valuation that requires determining the value of the property as a whole, rather than the value of its individual assets.  (See Rev. & Tax. Code,[3] §§ 108, 723; *ITT World Communications, Inc. v. City and County of San Francisco* (1985) 37 Cal.3d 859, 863 (*ITT*).)  The Board allocates the assessed value to individual counties.  The counties then apply a tax rate to the assessed value.  (*ITT*, at p. 864; §§ 755–756.)

There are two components to property tax rates: (1) a tax of 1% of the full cash value to fund county services, and (2) a debt service component.  (Cal. Const., art. XIII A, § 1; §§ 93, 100.)  The debt service component for common property is based on the amount needed to pay for the interest and principal on all voter-approved "bonded indebtedness" in the tax rate area in which the property is located.  (§ 93, subd. (c).)  Common property

---

Cal.App.4th 594, 600, fn. 3.)  The County also requested judicial notice of three volumes of exhibits (exhibits A–C) including legislative materials relating to article XIII, section 19 and Revenue and Taxation Code section 100.  We grant judicial notice of the County's exhibits A–C.  We have previously granted motions to file amici curiae briefs, including one submitted by the California Taxpayers Association.  However, we will not consider the Declaration of William G. Hamm, Ph.D., which was not presented to the trial court.  (See *City of Petaluma v. Cohen* (2015) 238 Cal.App.4th 1430, 1438, fn. 7.)

[3] Further unspecified statutory references are to the Revenue and Taxation Code.

is assigned to a "tax rate area" within the county.  A tax rate area is " ' "a specific geographic area all of which is within the jurisdiction of the same combination of local agencies and school entities for the current fiscal year." ' [Citation.]" (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 362.)  A county may have hundreds or thousands of tax rate areas. (*BNSF Railway Co. v. County of Alameda* (9th Cir. 2021) 7 F.4th 874, 881–882 (*BNSF*).)

Unitary property, including utilities, however, is assigned to one countywide tax rate area.  (§ 100, subd. (a).)  Section 100, subdivision (b) sets forth the formula for calculating the debt service tax rate of unitary property.  Unlike common property, the debt service component for unitary property is " 'based on the change in absolute dollars of the county's debt service rate.' " (*Placer*, *supra*, 111 Cal.App.5th at p. 642.)  The difference in the way the debt service component for common and unitary property is calculated can result in disparate debt service rates.

Appellants sued the County and the Board in Ventura Superior Court under sections 5140 and 5096 et seq., seeking property tax refunds for the fiscal years between 2018 and 2023. Appellants contended the property tax rate for utility property was set at a "discriminatory" rate "in excess of the average property tax rate" for common property in contravention of article XIII, section 19.  That section provides in relevant part: "The Board shall annually assess . . . property, . . . owned or used by regulated railway, telegraph, or telephone companies, car companies operating on railways in the State, and companies transmitting or selling gas or electricity.  This property shall be subject to taxation to the same extent and in the same manner as other property." (Cal. Const., art. XIII, § 19.)  The County demurred, contending that *Santa Clara, supra,* 87 Cal.App.5th

4

347 was binding precedent and required dismissal. The parties stipulated that *Santa Clara* was binding precedent and consented to judgment in favor of the respondents for the purpose of facilitating this appeal. (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 400.) Pursuant to the stipulation, the trial court sustained the demurrer and entered judgment in favor of the County and the Board.

## DISCUSSION

### *Unit taxation in California*

From 1910 into the 1930's, public utility property was subject to a "special gross receipts 'in lieu' tax" levied and collected by the state while common property was subject to regular ad valorem property taxes levied and collected by local government. (*ITT, supra*, 37 Cal.3d at p. 862.) By the early 1930's the Great Depression brought about a crisis in taxation. "Local tax rates were believed to be too high, in part because public utility property was not on the local tax rolls; state revenues were believed to be too low, in part because public utility tax rolls could be raised only by a two-thirds vote of the Legislature (Cal. Const., former art. XIII, § 14, subd. (f)) and the public utilities possessed sufficient political power to block such tax increases [citation]. In the face of this crisis, the Legislature drafted and the voters adopted an amendment to the Constitution known as the Riley-Stewart Plan, which completely revised this system of taxation. The special gross receipts 'in lieu' tax was repealed and public utility property was subjected to the regular ad valorem property tax, thus restoring public utility values to the local tax rolls and alleviating the local tax burden; the political problems inherent in taxing public utilities at the state level pursuant to legislatively set rates were eliminated by

5

having public utility property centrally assessed by the Board." (*ITT*, at p. 863.)

Article XIII, section 19[4] emerged from the 1930's constitutional amendments. Under article XIII, section 19, the Board annually assesses utility property and such property "shall be subject to taxation to the same extent and in the same manner as other property." Using the principle of unit valuation, the Board assesses the public utility property value "as a going concern," not as real property. (*ITT*, *supra*, 37 Cal.3d at pp. 864–865, italics omitted.) This means the Board considers the "earnings of the property as a whole," and not the value of any single asset. (*Id.* at p. 865.) Public utility property " 'cannot be regarded as merely land, buildings, and other assets. Rather, its value depends on the interrelation and operation of the entire utility as a unit. Many of the separate assets would be practically valueless without the rest of the system . . . .' Unit taxation prevents real but intangible value from escaping assessment and taxation by treating public utility property as a whole, undifferentiated into separate assets (land, buildings, vehicles, etc.) or even separate kinds of assets (realty or personalty)." (*Id.* at p. 863.)

"The unit taxation of public utility property is effected in four general stages. First, the Board annually assesses all unitary property of each public utility, that is, all property that it uses in performing its function. (§ 723.) In making this

---

[4] Article XIII, section 19 was initially numbered article XIII, section 14 of the California Constitution. It was renumbered in 1974 as part of a nonsubstantive reorganization of the California Constitution. (*ITT*, *supra*, 37 Cal.3d at pp. 870–871 & fn. 6.)

assessment, the Board uses the principle of unit valuation: . . . . Second, the owner of the public utility property is offered an opportunity to apply for corrections. (§§ 731, 741–749.)  Third, the Board transmits to the local taxing authority a roll showing the assessments against public utility property situated within its jurisdiction. (§§ 755–756, 758.)  In accordance with the principle of unit valuation, such assessments do not represent the value of the assets situated within that jurisdiction; rather, they represent the share of the value of the property as a whole that the Board has determined should equitably be allocated to the jurisdiction.  Thus, after it has assessed the value of the property as a whole, the Board makes a formulary allocation that has little or no relationship to the actual fair market value of the particular assets situated within the jurisdiction.  Fourth, the local taxing authority subjects the property so assessed to taxation at the rate fixed in its jurisdiction. (See §§ 755–756.)" (*ITT*, *supra*, 37 Cal.3d at pp. 863–864.)

Before 1986, tax rates for utility property worked similarly to common property because it was subdivided among multiple tax rate areas within a county.  In 1986, the Legislature enacted section 100 "in part to address the administrative burden that this tax system created for state-assessed unitary property and entities like the utilities that would receive potentially hundreds or thousands of tax bills from the various tax rate areas within a county, at varying rates." (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 363.)

Section 100, subdivision (a) provides: "Each county shall establish one countywide tax rate area.  The assessed value of all unitary and operating nonunitary property shall be assigned to this tax rate area.  No other property shall be assigned to this tax

7

rate area." Subdivision (b) then provides the formula to calculate the tax rate applicable to this tax rate area for unitary property.[5]

Section 100, subdivision (b)(1) "sets forth 'effectively a 1% general tax levy' [citation] akin to the 1 percent base tax, while subdivision (b)(2) sets forth the debt-service component tax rate, which is 'calculated as the previous year's unitary debt service rate, [citation], multiplied by the percentage change between the two preceding fiscal years in the county's ad valorem debt service levy (not rate) for the secured roll.' [Citations.]" (*Napa*, *supra*, 112 Cal.App.5th at pp. 962–963.) " 'The formula for the second [debt service] component means that the unitary rate is based on the change in absolute dollars of the county's debt-service rate, not changes in the percentage that taxpayers are paying.' [Citation.]" (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 362.)

Section 100, subdivision (b)(2)'s formula is unlike common property, where the debt service component for common property

_____

[5] Unitary property "shall be taxed at a rate equal to the sum of the following two rates: [¶] (1) A rate determined by dividing the county's total ad valorem tax levies for the secured roll, including levies made pursuant to Section 96.8, for the prior year, exclusive of levies for debt service, by the county's total ad valorem secured roll assessed value for the prior year. [¶] (2) A rate determined as follows: [¶] (A) By dividing the county's total ad valorem tax levies for unitary and operating nonunitary property for the prior year debt service only by the county's total unitary and operating nonunitary assessed value for the prior year. [¶] (B) Beginning with the 1989–90 fiscal year, adjusting the rate determined pursuant to subparagraph (A) by the percentage change between the two preceding fiscal years in the county's ad valorem debt service levy for the secured roll, not including unitary and operating nonunitary debt service." (§ 100, subd. (b.))

8

is based on the amount needed to pay voter-approved "bonded indebtedness" within a tax rate area. With common property, if the debt service costs are stable and assessed property value increases, the tax rate declines so that the debt service levy—the total amount of tax levied to meet the debt service costs—remains the same. And if debt service costs rise, but only at the same rate as assessed property values, the tax rate remains mostly the same. (See *BNSF, supra*, 7 F.4th at p. 882.) But with unitary property, a growth in the total dollar amount of debt service levy for common property means the debt service component of unitary property tax rates will increase based on the calculation in section 100, subdivision (b)(2).

*Standard of review*

We review an appeal from an order sustaining a demurrer de novo. " ' "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. [Citation.] We also consider matters which may be judicially noticed." [Citation.] Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context. [Citation.]' " (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.)

*ITT*

Appellants contend that our Supreme Court in *ITT, supra*, 37 Cal.3d 859, has already interpreted article XIII, section 19 to require "comparability in tax rates." But we conclude, as our sister courts did in *Merced*, *Santa Clara*, and *Napa*, that such language in *ITT* regarding the tax rate is not controlling precedent. (*Merced, supra*, 109 Cal.App.5th at pp. 853–856; *Santa Clara, supra*, 87 Cal.App.5th at pp. 370–371; *Napa, supra*, 112 Cal.App.5th at pp. 963–965.)

9

In *ITT*, our high court considered whether a provision of Proposition 13, which rolled back the assessed value of certain property to 1975–1976 values (Cal. Const., art. XIII A, § 2, subd. (a)), applied to unit taxation of utility property. (*ITT*, *supra*, 37 Cal.3d at p. 862.) The court held that the valuation rollback provision did not apply to the utility's property because " '[by] its terms, article XIII A applies only to real property taxes' " levied on locally assessed property. Utility property was state-assessed property subject to unit taxation, which is not "the taxation of real property or personal property or even a combination of both, but rather . . . the taxation of property *as a going concern*." (*Id.* at pp. 864–866.)

The utility plaintiff in *ITT* alternatively argued the valuation rollback provision applied "indirectly through the operation of article XIII, section 19" because "by requiring public utility property to be 'subject to taxation to the same extent and in the same manner as other property,' article XIII, section 19, requires public utility property to be *valued* on the same basis as other property, and thereby effectively applies the valuation rollback provision to the unit taxation of public utility property." (*ITT*, *supra*, 37 Cal.3d at pp. 869–870.) *ITT* disagreed, explaining that by "requiring that public utility property be 'subject to taxation to the same extent and in the same manner as other property,' article XIII, section 19, does not impose a requirement of equal valuation between public utility and other property, but simply specifies that public utility property, after it has been placed on the local tax rolls, be levied on at the same rate as locally assessed property, instead of being subject to a special gross receipts 'in lieu' tax. In other words, this comparability requirement was not intended to apply to the

*valuation* of public utility property, but only to its *taxation* after assessment." (*Id.* at p. 870.)

Because *ITT*, *supra*, 37 Cal.3d 859 only considered whether article XIII, section 19 applied to the *valuation* of property, we do not read *ITT*'s sentence regarding a tax "at the same rate" to require that the debt service tax rate for unitary property be comparable to the debt service tax rate for nonutility property such as locally assessed real property. As *Santa Clara* explained, *ITT* "was considering the assessment of property, rather than taxation rates. [Citation.] The California Supreme Court was not asked to—and did not—analyze or interpret the relevant language in article XIII, section 19. [Citation.] Nor [could] it examine the constitutionality of section 100(b), a statute that had not been enacted when the decision was issued. [Citation.] As cases are not authority for propositions not considered, we decide that the language in *ITT* upon which the utilities rely is dicta and does not determine the resolution of the question before us. [Citations.]." (*Santa Clara, supra*, 87 Cal.App.5th at pp. 370–371; see also *Merced, supra*, 109 Cal.App.5th at p. 856; *Napa, supra*, 112 Cal.App.5th at p. 964.)

We also conclude the "same rate" dicta is not persuasive authority. As observed in *Napa*, "the issue of a purported rate equivalency requirement was not presented in *ITT, supra*, 37 Cal.3d 859, and the *ITT* court offered no factual or legal analysis regarding public utility tax rates. Notably, *ITT*'s statement that article XIII, section 19 requires utility property to 'be levied on at the same *rate* as locally assessed property' was immediately followed by 'instead of being subject to a special gross receipts "in lieu" tax.' [Citation.] Thus, the sameness *ITT* was describing was the placement of state-assessed utility property on local tax

11

rolls alongside locally-assessed property, as distinguished from the prior separation of sources system in which public utility property was subject to a special in-lieu tax levied and collected by the state to support state government." (*Napa, supra*, 112 Cal.App.5th at p. 965.) *ITT* neither controls nor is persuasive here.

*Statutory interpretation*

Appellants contend the phrase "shall be subject to taxation to the same extent and in the same manner as other property" in article XIII, section 19 means utility property tax rates must be "comparable" to the tax rates of common property. Although they do not contend section 100 is unconstitutional on its face or should be struck down, Appellants contend they are owed refunds because section 100 results in unconstitutionally disparate tax rates. Appellants allege their tax rates are now about one and a half times the average rate for locally-assessed property in Ventura County and thus violate article XIII, section 19. We conclude article XIII, section 19 does not mandate comparable property tax rates.

Article XIII, section 19 states in its entirety:

> "The Board shall annually assess (1) pipelines, flumes, canals, ditches, and aqueducts lying within 2 or more counties and (2) property, except franchises, owned or used by regulated railway, telegraph, or telephone companies, car companies operating on railways in the State, and companies transmitting or selling gas or electricity. This property shall be subject to taxation to the same extent and in the same manner as other property.

12

"No other tax or license charge may be imposed on these companies which differs from that imposed on mercantile, manufacturing, and other business corporations. This restriction does not release a utility company from payments agreed on or required by law for a special privilege or franchise granted by a government body.

"The Legislature may authorize Board assessment of property owned or used by other public utilities.

"The Board may delegate to a local assessor the duty to assess a property used but not owned by a state assessee on which the taxes are to be paid by a local assessee."

"We begin with the fundamental rule that our primary task is to determine the lawmakers' intent. [Citation.] In the case of a constitutional provision enacted by the voters, their intent governs. [Citations.] To determine intent, ' "The court turns first to the words themselves for the answer.' " [Citations.] 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters).' [Citation.]" (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798.)

"But the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose or whether such a construction of one provision

is consistent with other provisions of the statute. The meaning of a statute may not be determined from a single word or sentence; the words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) We take account of "related provisions and the structure of the relevant statutory and constitutional scheme." (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 933.) If the language is ambiguous, we may consider extrinsic sources, such as ballot materials. (*Id.* at p. 934.)

Here, the plain text of article XIII, section 19 does not say "same rate" or "comparable rate." If the voters had intended for article XIII, section 19, to mandate application of the "same" or "comparable" property tax rate, we presume they would have said so. (*Santa Clara, supra*, 87 Cal.App.5th at p. 364; see also *Napa, supra*, 112 Cal.App.5th at p. 966.)

We agree with the statutory analysis in *Merced, supra*, 109 Cal.App.5th at pages 857–863, and also conclude that article XIII, section 19 does not bar disparate tax rates between utility and common property. *Merced* interpreted the language at the heart of the dispute—"shall be subject to taxation to the same extent and in the same manner as other property"—as an "enabling clause, announcing generally that certain utility property is now taxable." (*Merced*, at p. 858.) "An enabling clause is a specific part of a law or Constitution that gives authority to a government official or body to implement and enforce that law." (*Id.* at p. 858, fn. 6.) The language was not a "limiting clause" mandating that "utility property may only be taxed at the same rate as other property." (*Id.* at p. 858.)

14

This interpretation is supported by the text and broader context of the constitutional provision as a whole. The second paragraph (the third sentence) of article XIII, section 19 "expressly limits the types of taxes that may be imposed on utilities, noting that '[n]o other tax . . . may be imposed on these companies which differs from that imposed on mercantile, manufacturing, and other business corporations.' " (*Merced*, *supra*, 109 Cal.App.5th at p. 858.) The fourth sentence then provides "an exception to that rule, where a payment agreed upon 'for a special privilege or franchise granted by a government body' is not released merely because it differs from other businesses. [Citation.] Thus, it is apparent the drafters of Section 19 knew how to draft affirmative limitations restricting the ability to tax utilities when they intended to provide them. The fact that they did not do so in the first paragraph strongly weighs in favor of interpreting the language as an enabling clause, not a limiting clause." (*Ibid.*)

*Santa Clara* similarly observed that the third sentence of article XIII, section 19 "suggests the section as a whole contemplates that the rates applied to state-assessed utility property may differ from those applied to other property." (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 365.) The "third sentence applies to taxes or licenses imposed on the utility *companies* themselves. By contrast, the first two sentences of article XIII, section 19, pertain to assessment and taxation of utility *property*, and provide that the [Board] shall annually assess such property and that it shall then 'be subject to taxation to the same extent and in the same manner as other property.' (Art. XIII, § 19.) The second sentence does not say, as the third sentence does, that the taxes or rates must not differ." (*Ibid.*) *Santa Clara* further

15

interpreted the phrase—"[n]o *other* tax or license charge may be imposed on these companies which differs" (art. XIII, § 19, italics added)—to indicate that "a property tax imposed on the state-assessed property of those companies may differ. Consistent with this distinction, the second sentence provides that state-assessed property shall be '*subject to taxation* to the same extent and in the same manner.' (Art. XIII, § 19, italics added.) It does not say that such property '*shall be taxed* to the same extent and in the same manner.' In other words, it describes the condition of such property after the assessment, or valuation, stage, which precedes the separate taxation stage." (*Santa Clara*, at p. 366.)

*Santa Clara*, *Merced*, and *Napa* also relied on section 11 of article XIII of the California Constitution, which was enacted alongside the nonsubstantive revisions to article XIII, section 19 in 1974, to "demonstrate[] that the drafters recognized the distinction between being 'subject to taxation' and actually being taxed." (*Santa Clara*, *supra*, 87 Cal.App.5th at pp. 366–367; *Merced*, *supra*, 109 Cal.App.5th at pp. 859–860; *Napa*, *supra*, 112 Cal.App.5th at pp. 967–968.)

Section 11, subdivision (f) of article XIII of the California Constitution provides that "[a]ny taxable interest of any character, other than a lease for agricultural purposes and an interest of a local government, in any land owned by a local government that is *subject to taxation* pursuant to Section 11(a) of this Article *shall be taxed* in the same manner as other taxable interests." (Cal. Const., art. XIII, § 11, subd. (f), italics added.) *Santa Clara* concluded the phrases "subject to taxation" and "taxed" were used distinctly and "plainly do not mean the same thing in the context of section 11." (*Santa Clara, supra*, 87 Cal.App.5th at p. 367.) It "follows that 'subject to taxation' in

16

section 19 does not mean 'shall be taxed.'" (*Ibid.*, citing to *Bighorn-Desert View Water Agency v. Verjil* (2006) 39 Cal.4th 205, 213 ["when a word has been used in different parts of a single enactment, courts normally infer that the word was intended to have the same meaning throughout"]; see also *Merced, supra*, 109 Cal.App.5th at p. 859 [the "drafters knowingly used different words in different sections" of article XIII].)

The legislative history of article XIII, section 19 also supports our conclusion that it does not mandate comparable property tax rates for utility and common property. *Santa Clara* and *Merced* looked to the original text of article XIII, section 19, formerly section 14, as an interpretive aid. (*Santa Clara, supra*, 87 Cal.App.5th at pp. 367–368; *Merced, supra*, 109 Cal.App.5th at pp. 860–861.) With regard to other taxes and licenses, former section 14 stated that companies including utilities "shall be taxed in the same manner and *at the same rates* as the other listed types of business."[6] (*Santa Clara*, at p. 378.) By contrast,

---

[6] The complete text provides: "All companies herein mentioned and their franchises, other than insurance companies and their franchises, shall be taxed in the same manner and at the same rates as mercantile, manufacturing and business corporations and their franchises are taxed pursuant to section 16 of this article; provided, that nothing herein shall be construed to release any company mentioned in this section from the payment of any amount agreed to be paid or required by law to be paid for any special privilege or franchise granted by any political subdivision or municipality of this State; provided further, that no excise or income tax or any other form of tax or license charge shall be levied or assessed upon or collected from the companies, or any of them, mentioned in the first paragraph of this section, in any manner or form, different from, or at a higher rate than

17

elsewhere in "former section 14 [, its drafters] provided that the state-assessed property of those companies is '*subject to taxation to the same extent and in the same manner*.' (Cal. Const., former art. XIII, § 14.)" (*Id*. at pp. 367–368, italics added.) "The fact that former section 14 used the language 'to the same extent and in the same manner' in reference to utility property tax, and the language 'in the same manner and *at the same rates*' in reference to other taxes on utilities, shows that 'the same extent' does not mean 'at the same rates.' [Citations.] The language states only that utilities themselves must be subject to business taxes (such as sales or income taxes) at the same tax rates as other businesses. However, this limitation is clearly separate and distinct from a limitation on property tax rates. Thus, the original language of section 14 also supports the conclusion that current Section 19 does not impose a rate equivalence requirement between common property and utility property." (*Merced*, at p. 861, italics added; *Napa*, *supra,* 112 Cal.App.5th at p. 969.)

Santa Clara, *Merced*, and *Napa* also analyzed the legislative analyses and ballot materials related to former article XIII, section 14, and concluded that such materials further support that article XIII, section 19 does not require same or comparable property tax rates. (*Santa Clara*, *supra*, 87 Cal.App.5th at pp. 368–369; *Merced*, *supra*, 109 Cal.App.5th at pp. 862–863; *Napa*, *supra*, 112 Cal.App.5th at pp. 969–971.) We agree with the analyses in these cases, particularly *Santa Clara*'s conclusion that the official legislative analysis of former article

---

that imposed upon or collected from mercantile, manufacturing and business corporations doing business within this State." (Cal. Const., former art. XIII, § 14, italics omitted.)

18

XIII, section 14 (entitled Plan for Tax Relief presented in Sen. Const. Amend. No. 30 and Assem. Const. Amend. No. 68 to be submitted as Prop. 1 on Ballot of June 27, 1933 (Plan for Tax Relief)) reflects that "the purpose of article XIII, section 19 had nothing to do with mandating equal tax rates, but instead was to 'restor[e] public utility values to the local tax rolls and alleviat[e] the local tax burden'. [Citation.]" (*Santa Clara*, at p. 368.) The Plan for Tax Relief explained that the proposed provision would return " 'utility property to the local tax rolls to be taxed in the same way that other property is taxed' " while it "said nothing about imposing identical tax rates on utility property." (*Santa Clara*, at pp. 368–369.) *Merced* observed that the ballot materials related to former article XIII, section 14 told voters "that utility property would be subject to taxation in the same manner as was their common property, which had not been true for more than two decades. No express mention was made about the rates which would be imposed." (*Merced*, at p. 863.)

We have considered Appellants' judicially noticed materials and arguments, including those urging us to consider the historical and "unbroken" understanding of article XIII, section 19 as requiring comparable tax rates and the contemporaneous interpretations by administrative agencies. But, we are not persuaded. Appellants' arguments were rejected in *Napa*, *supra*, 112 Cal.App.5th at pages 971–973, which we adopt. Based on our review of the plain text and relevant legislative history, we conclude that article XIII, section 19 does not require equivalent or comparable property tax rates between utility and common property. For these reasons, we respectfully disagree with Justice Tucher's dissent in *Napa*. (*Napa*, at p. 981 (dis. opn. of Tucher, J.).)

*Article XIII, section 1*

Appellants also contend that section 1 of article XIII of the California Constitution (article XIII, section 1) generally requires uniformity in taxes, and thus article XIII, section 19 should be interpreted as requiring same or comparable property tax rates. Again, we are not persuaded. *Napa* rejected the same argument, and we adopt its reasoning. (*Napa*, *supra*, 112 Cal.App.5th at pp. 974–979.)

Article XIII, section 1 provides that "[u]nless otherwise provided by this Constitution or the laws of the United States: [¶] (a) All property is taxable and shall be assessed at the same percentage of fair market value. When a value standard other than fair market value is prescribed by this Constitution or by statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value. The value to which the percentage is applied, whether it be the fair market value or not, shall be known for property tax purposes as the full value. [¶] (b) All property so assessed shall be taxed in proportion to its full value." (Cal. Const., art. XIII, § 1.) This provision has been interpreted to generally express a rule of uniformity in how property is taxed. (*McClelland v. Board of Supervisors* (1947) 30 Cal.2d 124, 128–129.)

"[T]he uniformity principle of article XIII, section 1 [, however,] is not so restrictive that it would require the Legislature to overlook the[] very real differences between public utility property and common property in setting applicable tax rates. As has historically been the case, the Legislature is given ample breathing room to implement reasonable and nonarbitrary tax policies and practices that take into account the unique characteristics of public utility property." (*Napa*, *supra*, 112

Cal.App.5th at p. 979; see also *Delaney v. Lowery* (1944) 25 Cal.2d 561, 572 [no "lack of uniformity and discrimination" in differing tax rates for oil lease interests because such interests are "in a class by themselves and are different from other species of property"]; *People v. Keith Railway Equipment Co.* (1945) 70 Cal.App.2d 339, 350 [the California Constitution "does not require complete uniformity of taxation" and " 'taxpayers may be treated differently if they are of different classes and a law sufficiently meets the constitutional requirement if it acts uniformly upon the whole of any single class of individuals or objects, and the classification is founded upon some natural, intrinsic or constitutional distinction' "].)

Here, there are significant differences between utility and common property that require differences in how they are assessed and taxed to avoid utilities' "real but intangible value from escaping assessment and taxation." (*ITT*, *supra*, 37 Cal.3d at p. 863.) Section 100, subdivision (b) was enacted, in part, to account for these differences between unitary property and common property. (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 363.) We conclude that article XIII, section 1, does not require us to read article XIII, section 19 as mandating comparable property tax rates for utility and common property.

*Policy contention*

We acknowledge the overarching concern Appellants and their amici express regarding alleged disparately higher property tax rates on utility property and the "risks of abuse" that may result from excessive taxation. But our task is limited to deciding whether article XIII, section 19 mandates comparable property tax rates for utility and common property and whether those rates resulting from the application of section 100, subdivision (b)

21

are unconstitutional.  The Legislature is best equipped to respond to and, if appropriate, remedy the alleged property tax rate disparity.  (See *Merced*, *supra*, 109 Cal.App.5th at p. 867; *Santa Clara*, *supra*, 87 Cal.App.5th at p. 371; *Napa*, *supra*, 112 Cal.App.5th at p. 974.)

## DISPOSITION

The judgment is affirmed.  The County shall recover its costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>


BALTODANO, J.


We concur:



GILBERT, P. J.



CODY, J.

Henry J. Walsh, Judge

Superior Court County of Ventura

_____

Munger, Tolles & Olson, Benjamin J. Horwich, Gabriel M. Bronshteyn, Ginger D. Anders, Andra Lim, Faye Paul Teller, Kyle Groves; Capitol Law and Policy and Eric J. Miethke for Plaintiffs and Appellants.

Olson Remcho, Margaret R. Prinzing, Robin B. Johansen and Eric Lee for Defendant and Respondent County of Ventura.

No appearance for Defendant and Respondent California State Board of Equalization.

Gibson, Dunn & Crutcher, Bradley J. Hamburger, Shannon Mader and Nicholas Whetstone for California Senior Alliance, National Diversity Coalition, The Two Hundred for Homeownership, Community Repower Movement, RestoreLA-CDC, California Consumer Advocates for Affordability and Safety, and The California Black Chamber of Commerce as Amici Curiae on behalf of Plaintiffs and Appellants.

Greenberg Traurig, Colin W. Fraser, Cris K. O'Neall; and Bradley R. March for California Taxpayers Association, Orange County Taxpayers' Association, California Business Roundtable, The Howard Jarvis Taxpayers Association, The California Chamber of Commerce, Los Angeles County Business Federation, California Hispanic Chambers of Commerce, Hispanic Chambers of Commerce of San Francisco, Silicon Valley Leadership Group, and Valley Industry and Commerce Association as Amici Curiae on behalf of Plaintiffs and Appellants.

Renne Public Law Group and Michael K. Slattery for California State Association of Counties as Amicus Curiae on behalf of Defendants and Respondents.